934 F.2d 1127
 59 USLW 2730
 FRANKLIN SAVINGS ASSOCIATION, a Kansas Savings & Loan
Association; and Franklin Savings Corporation, a Kansas
corporation, in behalf of itself and in its derivative
capacity as controlling shareholder of Franklin Savings
Association, Plaintiffs-Appellees and Cross-Appellants,
v.
DIRECTOR, OFFICE OF THRIFT SUPERVISION, Defendant-Appellant
and Cross-Appellee,
and
The United States of America, Defendant-Intervenor and Cross-Appellee.
 Nos. 90-3272, 90-3281.
 United States Court of Appeals,
Tenth Circuit.
 May 28, 1991.
Rehearing and Rehearing En Banc Denied Sept. 10, 1991.
 
 Charles W. German of Stinson, Mag & Fizzell, Kansas City, Mo. (David E. Everson, Brant M. Laue, Richard F. Hunter of Stinson, Mag & Fizzell, Kansas City, Mo., Roger D. Stanton of Stinson, Mag & Fizzell, Overland Park, Kan., Paul D. Renner of Renner & Rodman, Denver, Colo., with him on the briefs), for plaintiffs-appellees and cross-appellants.
 Kenneth J. Guido, Jr., Sp. Sr. Counsel (Harris Weinstein, Chief Counsel, Thomas J. Segal, Associate Chief Counsel, Steven W. Dimmick, Sr. Trial Atty., with him on the briefs), Office of Thrift Supervision, Washington, D.C., for defendant-appellant and cross-appellee.
 Jacob M. Lewis, Dept. of Justice, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., Kansas, Lee Thompson, U.S. Atty., Kansas, Douglas N. Letter, Appellate Litigation Counsel, and Mark B. Stern, Appellate Staff Civ. Div., Dept. of Justice, Washington, D.C., with him on the brief), for defendant-intervenor and cross-appellee.
 Before McKAY, SETH, and BRORBY, Circuit Judges.
 BRORBY, Circuit Judge.
 
 
 1
 The Director of the Office of Thrift Supervision (Director) appeals the decision of the trial court ordering the removal of the director appointed conservator of Franklin Savings Association (Franklin).Background
 
 
 2
 A generalized and simplified overview of the facts will help reveal the parameters of this litigation.
 
 
 3
 Franklin is a state chartered, stock savings and loan association that has been doing business since 1889 in Ottawa, Kansas. Franklin has functioned during most of its existence as a traditional savings and loan association, accepting its depositors' money and in turn loaning these funds to borrowers. Loans were usually secured by a first mortgage on residential real estate. Franklin's profits were derived from the difference in interest paid to depositors and that collected from its borrowers.
 
 
 4
 In 1973, Franklin was acquired by new ownership who set it upon an expansion course. Franklin now has eight branches, all located in eastern Kansas. In addition, Franklin went "public" with approximately six per cent of its stock being publicly traded on NASDAQ.
 
 
 5
 In 1981, Franklin decided to adopt "innovative operating strateg[ies]" and "nontraditional" pursuits. Over the next eight years its deposits grew from $200 million to over $11 billion, bringing marked changes to the institution.
 
 
 6
 Franklin's asset base changed as it had acquired numerous forms of mortgage-backed securities.[1] This resulted in a volatile income stream. Franklin attempted both to predict the swings in its income stream with computer modeling, and to hedge its risks using additional and various forms of mortgage-backed securities. The securities bought and sold by Franklin included deep discounted securities, reverse repurchase agreements, long call and put options and strips (both interest only and principal only). Derivative securities (referred to by the district court as "TB 12 assets") entitle the holder to receive only part of the mortgage payments. Such securities are both higher risk and complex, and have only a thin secondary market. Franklin also began acquiring high-yield, noninvestment grade bonds, commonly known as junk bonds. Ultimately, mortgage-backed derivative securities and junk bonds comprised over thirty-five per cent of Franklin's total assets. In addition, Franklin had entered into several off-balance sheet transactions of the same type. Director identified these and other concerns in the form of a supervisory directive issued to Franklin. The underlying basis for Director's concern was the fact these assets were extremely sensitive to both interest rates and principal repayments. Director was also concerned about the liquidity (the ability to immediately turn the assets into cash), as necessary to pay depositors. Director's primary concern was the level of concentration of these assets, i.e., over thirty-five per cent of Franklin's total asset base.
 
 
 7
 Franklin's liabilities likewise underwent significant changes. Franklin began soliciting deposits nationwide through the use of brokered deposits. These deposits were typically short term and of high cost to Franklin. By the end of 1989, over seventy per cent of Franklin's deposits were brokered. To attract these deposits Franklin had to pay a higher than normal interest rate for a typical savings and loan and, as the deposits were short term, it had to be in a position to turn assets quickly into cash in order to pay depositors as their deposits matured. Director repeatedly expressed his concerns in regard to the extensive use of and significant reliance upon brokered deposits. In November 1989, Director specifically expressed his concern that Franklin's use of brokered deposits had increased significantly over the last six months, both in dollar amount and in relation to total deposits, again Director's primary concern being the level of concentration of these brokered deposits, i.e., over seventy per cent of Franklin's deposits were brokered.
 
 
 8
 Franklin's position in regard to its concentration of depositors' funds in these high-risk securities was simple. It maintained that it was accurately predicting the performance of these assets; that a market did exist for these assets; and that it had been shrinking the amount of these assets. Concerning its reliance upon brokered deposits, Franklin maintained that the costs of funds had nothing to do with the investments it acquired and that the cost of these funds was actually less than the cost of normal deposits.
 
 
 9
 Franklin's earnings were declining. Franklin's net interest margin began declining from over two per cent of its total assets in 1984 to less than one per cent by mid-1989. In the fifteen-month period ending December 31, 1989, Franklin had a loss in excess of $58 million. In August and September of 1989, while the assets were growing by $680 million, the tangible capital decreased by nearly $13 million. Earnings are an important source of capital, and Franklin's prospects of future profit appeared bleak. Director felt Franklin was facing losses in excess of $100 million for its improper deferral of hedging losses; incurred a $47 million loss in connection with letters of credit; and suffered a $185 million potential loss in connection with bonds Franklin had issued. Director again expressed his concerns to Franklin in November 1989, additionally pointing out that in the fiscal year ended June 30, 1989, Franklin paid its eight executive officers $3.5 million ($1.8 million of which was in bonuses) and paid dividends of approximately $15 million. This was done notwithstanding the fact Franklin itself reported a $9 million loss in that same fiscal year. These expenditures further impaired Franklin's earnings.
 
 
 10
 Director had many concerns about Franklin's capital structure. Franklin had unsuccessfully attempted to raise new outside capital. Franklin had also issued a significant amount of its letters of credit guaranteeing the payment of various bond issues that had originated with land developers. (Franklin euphemistically entitled this a "credit enhancement program.") Director ordered a write-down of capital in the amount of $47 million to reflect the risk associated with this credit program. Franklin used accounting methods to defer its actual cash hedging losses. Director ordered an additional write-down of $9 million in order for Franklin's books to accurately reflect these losses. Franklin had issued a significant amount of its own bonds ($3 billion) and Director also ordered a write-down of $185 million to reflect a possible exposure to a perceived risk of possible default. Director believed such a write-down was necessary to avoid a default in these bonds. Director had expressed these concerns to Franklin by pointing out that Franklin's net interest margin had been shrinking and in fact was negative for the past three quarters. Director criticized Franklin's recent continued, aggressive growth in light of these facts. To understand the significance of these facts, it is important to realize that both prudence and the law demand the owner of a financial institution invest some of his own assets in the institution. While capital requirements are complex and involve many factors, we will attempt to explain this requirement with the following illustration: When $100 is accepted in deposits, the owner must have $6 of his own assets in the institution as capital. The bottom line in this case was simple--Franklin was intentionally and aggressively growing without a corresponding growth in capital. In fact, Franklin's capital was shrinking. Moreover, Director had repeatedly and explicitly expressed to Franklin his concern with these matters.
 
 
 11
 Franklin's position concerning the write-downs ordered by Director is that they were unnecessary as the risks identified by Director did not exist.
 
 
 12
 By mid-1989, Franklin's metamorphosis was complete. It had been transformed from a traditional savings and loan into something totally different. On June 30, 1989, Franklin's business consisted primarily of attracting savings deposits from the general public nationwide and investing these funds in various mortgage derivative products and mortgage-related assets. Over eighty-three per cent of its interest-earning assets were designated as "assets held for sale." Only 3.3 per cent of its total assets were contained in its loan portfolio. Franklin began to resemble a securities trading firm rather than a traditional savings and loan association.
 
 
 13
 Such a characterization is not a surprise to Franklin. Director had conducted various examinations and special audits during which there had been numerous meetings, telephone calls, and correspondence between Director and Franklin relating to the numerous problems found by Director. Director had also issued specific directives to Franklin to deal with these concerns but Franklin was either unable or unwilling to comply with the directives.
 
 
 14
 On February 15, 1990, Director, apparently deciding the failure to address his concerns must be remedied, made specific findings. These findings were based upon three volumes of documents that included reports of examinations, monthly, quarterly and annual financial reports filed by Franklin, supervisory directives, other required annual reports, and the results of an independent audit. These findings included the following:
 
 
 15
 [Franklin] is in an unsafe and unsound condition to transact business in that, among other things, [Franklin] has a significant level of high risk assets, and has placed undue reliance on brokered deposits, (b) [Franklin] has incurred and is likely to incur losses that will deplete all or substantially all of its capital, and there is no reasonable prospect for [Franklin]'s capital to be replenished without Federal assistance, and (c) there is a violation or violations of laws or regulations, or an unsafe or unsound practice or condition which is likely to cause insolvency or substantial dissipation of assets or earnings or is likely to weaken the condition of [Franklin] or otherwise seriously prejudice the interests of its depositors....
 
 
 16
 Director thereupon proceeded to appoint "not for the purpose of liquidation" the Resolution Trust Corporation as conservator for Franklin.
 
 Proceedings in District Court
 
 17
 Franklin promptly filed an action pursuant to 12 U.S.C. Sec. 1464(d)(2)(E) asking that Director be required to remove the conservator.[2] This complaint alleged, inter alia, the absence of the statutory grounds for the appointment of a conservator and asserted the regulatory action was arbitrary and capricious. Director filed a copy of the administrative record contending the trial court's review was limited to this record in accordance with the principles of administrative law.
 
 
 18
 The trial court rejected Director's approach and crafted a hybrid standard of review. Franklin Sav. Ass'n v. Director of Office of Thrift Supervision, 742 F.Supp. 1089 (D.Kan.1990) ("Franklin II" ).[3] The trial court, citing Collie v. FHLBB, 642 F.Supp. 1147 (N.D.Ill.1986), decided Franklin should have the opportunity to submit evidence outside the administrative record as to "whether or not that evidence was considered" by Director, and "to develop any facts bearing on the question of whether any of the statutory grounds existed." Franklin II at 1097. After reviewing the administrative record and the evidence presented to it by both Franklin and Director during an eighteen-day bench trial, the district court viewed the entire package of evidence to determine whether Franklin had overcome the presumption of correctness afforded the agency's action. The trial court correctly noted this would require Franklin to show by a preponderance of the evidence that the agency's decision "lacked any basis in fact or law or was arbitrary, capricious, or an abuse of discretion." Franklin II at 1096.
 
 
 19
 The trial court characterized this case as "a dispute over accounting practices," Franklin II at 1094, and heard numerous expert witnesses. While difficult to summarily describe the basis of the trial court's conclusions, it appears the court was more impressed with Franklin's expert witnesses than those of Director, consequently accepting the testimony advanced by those witnesses and rejecting the testimony advanced by Director's experts. In so doing, the trial court found Director "lacked any factual basis which would justify its appointment of a conservator" and further concluded Director "acted arbitrarily and capriciously in appointing the conservator." Franklin II at 1126. The trial court ordered Director to remove the conservator, an order which this court stayed and from which this appeal ensues.
 
 I.
 Scope of Review
 
 20
 Director contends the trial court should have reviewed Director's decision to appoint a conservator upon the basis of the administrative record and in accordance with the Administrative Procedure Act ("APA"). Franklin contends, however, the expanded hybrid scope of review, as fashioned by the trial court, was correct. Whether the trial court properly limited the scope of review is a question of law, which we review de novo.
 
 
 21
 For the sake of clarity, we deal separately with the scope of review and the standard of review. The scope of judicial review refers merely to the evidence the reviewing court will examine in reviewing an agency decision. The standard of judicial review refers to how the reviewing court will examine that evidence.
 
 
 22
 We must first define the proper scope of review for a reviewing court when it reviews a director's decision to appoint a conservator for a savings and loan association. While FIRREA[4] expressly provides the authority for the director to appoint a conservator, we must examine whether Congress also established or defined the scope of review to be employed when reviewing appointment decisions. FIRREA was Congress's response to the many significant problems existing within the savings and loan industry. These problems include poor management by the owners of the thrifts; poor underwriting and loan administration standards; inadequate supervision of the thrifts by the regulators; and reliance on brokered deposits or other highly volatile sources of funds. H.R.Rep. No. 101-54(I), at 299-301 (1989), U.S.Code Cong. & Admin.News 1989, pp. 86, 95-97. Congress recognized the nation was and is facing a crisis in the thrift industry and consequently FIRREA dictates strong and prompt supervisory oversight. Id. at 307-308, U.S.Code Cong. & Admin.News 1989, pp. 103-104.
 
 
 23
 FIRREA creates the Office of Thrift Supervision and the position of a director. The director is given extremely broad regulatory powers as he is required to "provide for the examination, safe and sound operation, and regulation of savings associations." 12 U.S.C. Sec. 1463(a)(1). FIRREA likewise gives the director very broad enforcement powers including the power to appoint a conservator if "in the opinion of the Director" a statutory ground for appointment exists. 12 U.S.C. Sec. 1464(d)(2)(E).
 
 
 24
 The pertinent portions of 12 U.S.C. Sec. 1464(d)(2)(E) provide:
 
 
 25
 The Director shall have exclusive power and jurisdiction to appoint a conservator.... If, in the opinion of the Director, a ground for the appointment of a conservator ... exists, the Director is authorized to appoint ex parte and without notice a conservator.... In the event of such appointment, the association may ... bring an action ... for an order requiring the Director to remove such conservator ..., and the court shall upon the merits dismiss such action or direct the Director to remove such conservator....
 
 
 26
 The plain language of this statute reveals: (1) the director has the exclusive power to appoint a conservator; (2) the director may appoint a conservator if, in his opinion, a statutory ground for the appointment exists; (3) assuming the director has opined the ground for the appointment of a conservator does exist, his decision whether to appoint a conservator is discretionary; and (4) the statute, while clearly authorizing judicial review of the director's decision, fails to specifically define the scope of that review.[5]
 
 
 27
 We first emphasize FIRREA establishes that the determination of whether the statutory grounds to appoint a conservator exist lies in the province of the director's opinion. The plain, ordinary, and usual meaning of the word "opinion" is a belief held with confidence, not substantiated by direct proof or knowledge. See Webster's II, New Riverside University Dictionary (1988). An opinion is formed after an evaluation of the facts based upon special knowledge and expertise. Congress did not mandate a hearing or specific findings of fact be made; rather, it required only the director be of the opinion statutory grounds for appointment of a conservator exist. There exist compelling reasons for this statutory provision: A savings association's assets consist principally of its depositors' funds; assets can be quickly dissipated; liabilities may be just as quickly created; and liquidity may suddenly disappear. If there is inadequate capital to absorb losses, the losses fall upon the FDIC, and if these funds are depleted, then upon taxpayers. For these reasons, Congress made clear it expects the director to be vigilant and responsive. FIRREA's statutory scheme, the specific statute at issue (12 U.S.C. Sec. 1464(d)(2)(E)), and the legislative history, all agree it is essential the director act promptly in appointing a conservator once he is of the opinion that a statutory ground exists. The close supervision, broad discretion, and quick response directed by FIRREA dictates a narrow and limited scope of review that gives deference to the director's judgment, knowledge, and expertise.
 
 
 28
 In cases where Congress has provided for judicial review without setting forth the standards to be used or procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most instances,[6] no de novo proceedings may be had. Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419-20, 91 S.Ct. 814, 825-26, 28 L.Ed.2d 136 (1971); United States v. Carlo Bianchi & Co., 373 U.S. 709, 715, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963); Woods, 826 F.2d at 1406; Guaranty Sav., 794 F.2d at 1342.
 
 
 29
 A reviewing court may go outside of the administrative record only for limited purposes. For example: Where the administrative record fails to disclose the factors considered by the agency, a reviewing court may require additional findings or testimony from agency officials to determine if the action was justified, Overton, 401 U.S. at 420, 91 S.Ct. at 825; or where necessary for background information or for determining whether the agency considered all relevant factors including evidence contrary to the agency's position, Thompson v. United States Dept. of Labor, 885 F.2d 551, 555 (9th Cir.1989); or where necessary to explain technical terms or complex subject matter involved in the action, Animal Defense Council v. Hodel, 867 F.2d 1244, 1244 (9th Cir.1989), and Animal Defense Council v. Hodel, 840 F.2d 1432, 1436 (9th Cir.1988).
 
 
 30
 Franklin cites numerous district court cases that it contends should persuade us to interpret Sec. 1464(d)(2)(E) as requiring either a hybrid scope of review, as was adopted by the trial court, or some other form of an expanded scope of review. For instance, Franklin cites Haralson v. FHLBB, 655 F.Supp. 1550, 1557-58 (D.D.C.1987), where the court in interpreting the former, nearly identical statutory provision of the Home Owner's Loan Act of 1933, 12 U.S.C. Sec. 1464(d)(6)(A), acknowledged that as long as a post-deprivation hearing is provided, there will be no due process violation; and Collie, 642 F.Supp. at 1152, where the court held that under the former but nearly identical law, the savings and loan association had the right to a meaningful opportunity at some point to make its case in opposition to the appointment. Collie, the case embraced and adopted by the trial court in the case before us, and other cases of similar nature, were discussed and analyzed by the Fifth Circuit in Woods, 826 F.2d at 1406-08, where the court found the analysis employed in these cases unpersuasive. In Woods, the court held the "upon the merits" language of Sec. 1464(d)(6)(A) did not require a full adversarial and evidentiary hearing, nor did it mandate de novo review of appointment decisions made pursuant to the statute. See also Carlo Bianchi, 373 U.S. at 715, 83 S.Ct. at 1413; Guaranty Sav., 794 F.2d at 1342. Rather, the court held such decisions are to be reviewed on the basis of the administrative record and in accordance with the APA. Woods, 826 F.2d at 1408. We agree with the Fifth Circuit's decision in Woods, and are equally unpersuaded by Collie and the other district court decisions holding otherwise.
 
 
 31
 We therefore find the district court erred in adopting the reasoning set forth in Collie, 642 F.Supp. at 1150-52, and deciding the phrase "upon the merits," as used in Sec. 1464(d)(6)(A), directed something more than a review of the administrative record in accordance with the APA. Franklin II, 742 F.Supp. at 1096-97. Review "upon the merits" simply means the district court's decision to either dismiss the action or remove the conservator should be based upon the merits of the action (i.e., whether statutory grounds for the appointment of a conservator exist), rather than on procedural or policy oriented grounds. See Guaranty Sav., 794 F.2d at 1342. Again, we conclude the proper scope of review for appointment decisions made pursuant to Sec. 1464(d)(6)(A) is that review be confined to the administrative record in accordance with the APA.
 
 
 32
 Franklin argues the Supreme Court's decision in Overton dictates an expanded scope of review. Overton revolved around a statutory prohibition against building highways through a public park where a feasible and prudent alternate route exists. The Secretary authorized the construction of a six-lane highway through a public park. The Secretary failed to make any factual findings as to why he believed there was no feasible and prudent alternate route. The Supreme Court held formal findings were not required. Overton, 401 U.S. at 419, 91 S.Ct. at 825. The Court further held: the Secretary's decision was subject to judicial review; de novo review was not required; the Secretary's decision need not meet the substantial evidence test; and the applicable standards of Sec. 706 of the APA require the reviewing court "to engage in a substantial inquiry." Overton, 401 U.S. at 415, 91 S.Ct. at 823. In Overton, the lower court's review was based upon litigation affidavits. As the Supreme Court found this to be an inadequate basis, it remanded with instructions that the district court could require the administrative officials who participated in the decision to give testimony or require the Secretary to make formal findings explaining the action taken. Overton, 401 U.S. at 420, 91 S.Ct. at 825. We believe Overton is thus distinguishable and does not dictate an expanded scope of review.
 
 
 33
 In the case before us, Director did make formal findings and produced and certified a voluminous and detailed agency record for review that would enable the reviewing court to conduct a substantial and meaningful review from the agency record. The trial court, however, determined the three-volume administrative record, as designated by Director, was not the "whole administrative record" since it believed there were missing documents upon which Director relied. Franklin II at 1098. The appropriate remedy for this alleged defect would have been for the trial court to call for any missing documents or require Director to testify or provide further explanation. Instead, the district court crafted and conducted a hybrid scope of de novo review. While the director has an obligation to produce for judicial review a designated administrative record, such record does not have to be needlessly elaborate, nor as detailed as the district court here required.
 
 
 34
 For example, while the November 1989 supervisory directive issued to Franklin states merely that Franklin has increased its reliance on brokered deposits to an unacceptable level, there exist many other references in the agency record condemning Franklin's excessive use of brokered funds. It is certainly not necessary for the administrative record to contain extensive treatment on the use of brokered funds, their pros and cons, and what levels are excessive. Such information is common knowledge to those in the banking industry. To the extent the specific material was considered by Director and not included in the agency file, the proper approach is to call for the production of such documents or require further testimony relating thereto. In the instant case, there were numerous meetings between personnel of both Director and Franklin. The trial court, having found there were no notations as to what statements were made at the meetings, what issues were discussed, or what Franklin's positions were regarding those issues, determined the record was incomplete and therefore defective. Franklin II at 1098 n. 5. This determination is simply incorrect. As a practical matter, the director reviews certain selected materials. Ordinarily, these materials will include: the required reports submitted by the savings association; the reports of examination; the reports of independent auditors; supervisory directories; the responses by the savings association; and such additional information as desired by the director to have reviewed. To require the director to have reviewed and relied on all working papers, synopses of all conversations, and other minutiae, would defeat FIRREA's objective requirement of prompt supervisory action. The director need review only such information as he deems necessary or desirable to enable him to arrive at an informed and fair opinion. Absent extraordinary circumstances, the decision of the director as to what information he must review to make an appointment decision should be left to his discretion. The director, in the case of judicial review of his appointment decision, has the obligation to produce and certify the record upon which he relied at the time of the decision. This record must contain sufficient data to allow the reviewing court to determine whether the director had a rational basis for the appointment decision. In the case before us, the administrative record contained voluminous data including: the executive summary; legal memorandum; Director's orders; state commissioner's letters; recommendation memorandum; interim reports of examination; reports of examination; supervisory reports; supervisory directives; the June 30, 1989 independent audit; the 10-K annual report for the year ended June 30, 1989; and many further reports, analyses and documents. This record was adequate to permit meaningful judicial review.
 
 
 35
 Franklin argues the agency record is one-sided and fails to contain any of Franklin's documents showing their analysis. Franklin contends these factors dictate an expanded scope of review. In making these assertions, Franklin ignores the substance of the agency record, which contains numerous recitations of Franklin's views and reasons therefor. A reading of the administrative record clearly shows the substance of Franklin's positions were before Director when the appointment decision was made. The director is not required to review every document arguably related to the troubled institution in question, nor is a reviewing court. We note again the administrative record in the instant case is extensive. The record shows Franklin had numerous opportunities to present its views and that those views were considered by Director. Moreover, the record provides ample support for Director's appointment decision.
 
 
 36
 Franklin also objects to the lack of a prior hearing. 12 U.S.C. Sec. 1464(d)(2)(E) affords the association to which a conservator has been appointed the opportunity for judicial review of the appointment decision. The availability of this post-deprivation hearing precludes any due process violations. See Franklin II at 1126; Haralson v. FHLBB, 837 F.2d 1123, 1126 (D.C.Cir.1988). Thus, we find Franklin has no basis to claim a constitutional deprivation on this ground.
 
 
 37
 In summary, we conclude the district court, in reviewing the director's decision to appoint a conservator, should confine its review to that information before the director at the time the appointment decision was made. When the director learns the appointment decision has been challenged, the director has the obligation to produce the information that he relied upon in making his decision to the district court and to certify such information is accurate and complete. Thus, the director's obligation does not extend to all information contained in his files. Should the savings and loan association challenging the appointment decision desire additional information from the agency record than that presented by the director to the district court, it may request such information in accordance with the applicable rules of discovery and evidence.
 
 
 38
 Our conclusion in this case is bolstered by the overall regulatory scheme involved and the nature of the controversy. The regulatory scheme requires the financial institution submit periodic reports to the director. These reports present a balance sheet, a profit and loss statement, and other detailed financial information. The director performs periodic examinations, which in part are designed to assure the accuracy of the financial information submitted by the financial institution. In other words, the regulatory system is designed to assure a high degree of reliability in the raw data or books of account. In the controversy before us neither party has disputed the accuracy of the basic data. For example, neither the amount of total deposits nor the amount of the brokered deposits are in dispute. It is only basic policy decisions, such as whether the degree of Franklin's reliance upon brokered deposits constitutes an unsafe or unsound practice, that are now being disputed.
 
 
 39
 In summary, the statutory scheme, the legislative history, the APA, the applicable case law, and the regulatory scheme all lead us to the conclusion that when a court reviews the director's decision to appoint a conservator for a savings and loan association, the reviewing court should ordinarily confine its review to that information that was before the director at the time the appointment decision was made.
 
 
 40
 By our holding today, we do not place any strict limitations on the admission of other evidence in certain narrow circumstances. However, such evidence should be received with caution. In addition, of the narrow exceptions to the general rule that do exist, none is applicable to the present case.
 
 
 41
 The focus of the judicial review is to determine whether there exists sufficient evidence in the administrative record to form a reasoned opinion that the statutory grounds for the appointment of a conservator exist. In this case, the district court heard live testimony from twenty-five witnesses; accepted deposition testimony from eighteen witnesses; received over 650 trial exhibits; engaged in credibility determinations regarding competing experts; and basically made its own findings, compared those to the findings of Director, and decided the conservator was wrongly appointed. Such a review was far beyond the court's permissible scope of review. We therefore find the district court erred in improperly expanding the scope of its review.II.
 
 Standard of Review
 
 42
 Having defined the applicable scope of review, we must next determine the standard of review to be applied by the district court. See 12 U.S.C. Sec. 1464(d)(2)(E).
 
 
 43
 As 12 U.S.C. Sec. 1464(d)(2)(E) fails to define or specify the standard of review to be used in examining Director's appointment decision, we look to the APA for guidance. 5 U.S.C. Sec. 706(2)(A) of the APA directs the reviewing court to use the arbitrary or capricious standard of review. 5 U.S.C. Sec. 701 of the APA provides the action of "each authority" of the government of the United States is subject to judicial review except where there exists a statutory prohibition on review, or where "agency action is committed to agency discretion by law." In the case before us, the statute that gives the director authority to appoint a conservator, 12 U.S.C. Sec. 1464(d)(2)(E), also provides for judicial review. Congress intended for the courts to review whether the facts relied on by the director show a statutory ground for the appointment to exist. We note that once a director has determined statutory grounds for the appointment of a conservator exist, the decision whether to appoint is within his discretion. However, this is not the question before the court today. What is before this court is the question: What is the standard of judicial review once the decision to appoint a conservator is made by the director, and thereafter challenged by the savings and loan association?
 
 
 44
 Here, Franklin challenged Director's decision to appoint a conservator in accordance with 12 U.S.C. Sec. 1464(d)(2)(E). A court reviews the director's decision based upon the record before the director at the time of his decision. In conducting this review, the director's findings are entitled to deference, and the appointment decision itself is entitled to a presumption of regularity. Overton, 401 U.S. at 415, 91 S.Ct. at 823. Franklin has the burden to overcome these presumptions. See Guaranty Sav., 794 F.2d at 1342.
 
 
 45
 We believe it significant to note the case before us does not involve the more severe decision to appoint a conservator for the purpose of liquidation. Indeed, a conservator ordinarily acts as a guardian or a protector. The decision to appoint a conservator is not a judgment to divest the owner of his property. Rather, it is a judgment that the owner is unable or unwilling to properly manage or control the assets and it is an attempt to put the institution back into a safe and sound condition. H.R.Rep. No. 101-54(I), at 126, 211. This fact permits both a restricted scope of review and a deferential standard of review.
 
 
 46
 Two other circuits have addressed the standard of judicial review under the Home Owner's Loan Act of 1933, 12 U.S.C. Secs. 1461-1468, which contained virtually identical statutory language as that in the present 12 U.S.C. Sec. 1464(d)(6)(A). In Woods, 826 F.2d 1400, the Fifth Circuit looked at the "strong congressional intent for swift, effective regulatory action" mandated by 12 U.S.C. Sec. 1464(d)(6)(A), id. at 1407, and held the appointment decision must be reviewed on the basis of the administrative record in accordance with the APA's arbitrary or capricious standard of review. 5 U.S.C. Sec. 706(2)(A).[7] In Guaranty Sav., 794 F.2d at 1342, the Eighth Circuit also concluded the agency decision should be reviewed applying the arbitrary or capricious standard set forth in 5 U.S.C. Sec. 706(2)(A) of the APA. We are persuaded by the analysis employed in these decisions and believe it is applicable to FIRREA and, therefore, to the case before us.
 
 
 47
 In sum, we conclude and hold: (1) the scope of review is ordinarily limited to the agency record before the director at the time he made his decision to appoint a conservator; and (2) the standard of review to be utilized is that specified by the APA in 5 U.S.C. Sec. 706(2)(A) that an appointment decision may be set aside only if the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."
 
 
 48
 While the district court articulated the standard of judicial review correctly, its actions in applying this standard resulted in error as it in fact applied a de novo review. We now turn our attention to this matter.
 
 III.
 Review of Director's Decision
 
 49
 On appeal from a district court's review of an agency action, the appellate court " 'must render an independent decision on the basis of the same administrative record as that before the district court; the identical standard of review is employed at both levels; and once appealed, the decision of the district court is afforded no particular deference.' " Webb v. Hodel, 878 F.2d 1252, 1254 (10th Cir.1989) (quoting Brown v. United States Dept. of Interior, 679 F.2d 747, 748-49 (8th Cir.1982) (citations omitted)). As we have discussed, review of the appointment decision is governed by the APA. 5 U.S.C. Secs. 701-706. Accordingly, we must uphold the agency's actions, findings, and conclusions unless they are: outside the agency's statutory authority; unsupported by substantial evidence; found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to a constitutional right or privilege; without observance of required procedure; or unwarranted by the facts to the extent the facts are subject to a trial de novo by the reviewing court. 5 U.S.C. Sec. 706(2)(A)-(F). A reviewing court may not substitute its judgment for that of the agency. Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983).
 
 
 50
 Franklin urges us to apply a clearly erroneous standard to the factual findings of the district court. This we decline to do. We review the agency action based on the same file and under the same standard as was proper for the district court. We further decline to apply the clearly erroneous standard to findings of the district court as we have decided the district court improperly exceeded its permissible scope of review. We feel compelled to observe that Franklin has consistently misunderstood that the fact finder in this case is Director and not the district court. It is to Director's findings that some deference is due and not to those later made by the district court.
 
 
 51
 As we have held, the trial court failed to confine its review to the agency record and failed to apply the proper standard of review. In view of the fact that our task as an appellate court is essentially the same as the district court's, we will proceed to review the agency record. We believe little would be accomplished at this point by a remand to the district court.
 
 
 52
 Our review commences with an examination of the statutory grounds for the appointment of a conservator. 12 U.S.C. Sec. 1464(d)(2)(A) sets forth at least eight separate grounds for the appointment of a conservator. In the instant case, Director found three of these grounds exist. We will examine each of these three grounds separately, although a determination that Director correctly found the existence of any one of the three statutory grounds is sufficient to uphold Director's appointment decision.A. Unsafe and Unsound Condition
 
 
 53
 The first statutory ground Director found to exist was 12 U.S.C. Sec. 1464(d)(2)(A)(iii), which is "an unsafe or unsound condition to transact business including having substantially insufficient capital or otherwise."
 
 
 54
 Director found this circumstance to exist based on, among other things, Franklin's significant level of high-risk assets and its undue reliance on brokered deposits.
 
 
 55
 We turn our attention to the administrative record to search for evidence regarding Franklin's level of high-risk assets. We quote a portion of the voluminous data bearing on this subject:
 
 
 56
 [A] significant portion of the Association's asset portfolio is comprised of high risk assets such as principal-only and interest-only strips of mortgage backed securities, residuals of collateralized mortgage obligations ("CMO") and real estate mortgage investment conduits planned amortization classes and targeted amortization classes of the CMO, and other high-risk derivative products.... These assets are subject to extreme price volatility, interest rate risk, as well as significant prepayment risk. As of January 9, 1990, the Association had High Risk Assets totaling $3,715,671,000, or 40.15% of total assets.
 
 
 57
 ... [B]ecause of the Association's tight interest margin, the Association will experience significant losses with respect to these High Risk Assets irrespective of whether interest rates increase or decrease. In addition, the prepayment risk cannot be hedged against with any certainty because it is affected by factors other than rising or falling interest rates, and many of the assets are keyed to varying speeds of prepayment.
 
 
 58
 ... [B]ecause the Association is considered a "primary market maker" in the residuals market, the Association may be unable to successfully liquidate its investments in the High Risk Assets in the event of a thin market. Therefore the Association's High Risk Assets are subject to significant liquidity risk due to the lack of an adequate secondary market. The Association's significant level of High Risk Assets thus places it in an unsafe and unsound condition to transact business.[8]
 
 
 59
 After hearing the evidence presented at trial, the district court arrived at the following conclusions regarding Franklin's significant level of high-risk assets: (1) through the efforts of Franklin's management the sensitivity to interest rate risk and prepayment risk had declined and was anticipated to decline further, Franklin II at p 183; (2) markets exist for these high-risk assets as Franklin purchased them from dealers, id. at p 185; (3) Director's criticism about the level of these high-risk assets was "inappropriate" because Franklin is reducing the amount of these high-risk assets, id. at p 186; and (4) Franklin was properly monitoring and managing these assets, id. at p 187.
 
 
 60
 The district court failed to understand the significance of Director's concerns. Director's primary concerns involved the fact that Franklin's assets were not sufficiently diversified, and far too high a concentration of its assets existed in high-risk securities. Director opined this was undesirable as the markets were extremely volatile. In other words, the value of these assets could and would change significantly and rapidly. Director knew the assets had to be sold as they were matched to the maturity of the deposits, and Director predicted (and gave reasons supporting his prediction) that whether interest rates went up or down, Franklin would incur losses when it sold these assets. Director's evidence also established that Franklin was the primary market for these high-risk assets. The district court's factual findings fail to address any of these concerns. The fact that Franklin was doing a good job monitoring these assets, was reducing the level of these assets, and had reduced the sensitivity to interest rate risk and prepayment risk, is simply irrelevant to Director's determinations. Quite simply stated: the district court ignored the data contained in the administrative record and Director's concerns; substituted its judgment for that of Director's concerning the acceptable level of these high-risk assets; ignored the predictive judgment of Director that a sale of these assets would likely result in a loss; and afforded no deference to Director's knowledge and expertise. Again, the district court, while using the language employed in the proper, arbitrary or capricious standard, in fact applied a de novo standard in its review.
 
 
 61
 There exists ample evidence in the agency record to establish a high level or undue concentration of high-risk assets. The most that can be said of Franklin's evidence concerning these high-risk assets and their level of concentration is that experts may disagree. Director's experts opined that forty per cent of such assets was too much, and Franklin's experts opined this level was acceptable. Conflicting expert opinion, however, is not sufficient to allow a reviewing court to conclude the agency decision was arbitrary, capricious or an abuse of discretion, nor is such evidence sufficient to overcome the presumption of regularity and correctness afforded to the appointment decision. Overton, 401 U.S. at 415, 91 S.Ct. at 823; Guaranty Sav., 794 F.2d at 1432.
 
 
 62
 We next turn our attention to Director's finding that Franklin placed undue reliance upon brokered deposits. The administrative record reveals that over seventy per cent of Franklin's deposits were brokered. Again we quote from the agency file:
 
 
 63
 [T]he Association has funded its growth largely with brokered deposits. As of December 31, 1989, the Association had brokered deposits of $3,290,981,000, or 70.7% of total deposits.... [T]he high level of brokered deposits, an expensive source of funds, is contributing to the Association's narrow net interest margin and operating losses.... [T]he Association has no alternative, lower cost funding sources due to its limited amount of eligible collateral available to pledge against lower cost borrowings. The Association's excessive reliance on brokered deposits places it in an unsafe and unsound condition to transact business.
 
 
 64
 In looking to the district court's factual conclusions regarding Director's concerns over Franklin's high level of brokered deposits, Franklin II at pp 169-179, the court, based upon conflicting expert testimony, found the following: (1) Franklin's cost of brokered deposits was declining, Franklin II at p 172; (2) Franklin was setting an interest rate significantly under the market and yet consistently obtained brokered deposits at that below market rate, id. at p 173; (3) Franklin had a relatively low cost of these funds as Director failed to take into account the costs of servicing these accounts, id. at p 174; (4) Franklin's cost of these funds included its hedging costs while other institutions did not, id. at p 177; (5) Franklin's cost of funds plays no part in its investment decisions, id. at p 178; and (6) therefore Franklin's cost of funds do not present a safety or soundness concern, id. at p 179.
 
 
 65
 Again, the district court failed to appreciate the significance of Director's concerns. A financial institution obtains brokered deposits by soliciting these deposits. They are termed brokered funds because the financial institution pays a commission to the broker who obtains the funds. Indeed, the audit statement of Franklin's own accountants shows that Franklin paid such commissions in significant amounts--$1.9 million in the 1988-89 fiscal year, and $2.5 million in the 1989-90 fiscal year. These deposits are attracted by higher than normal interest rates from those persons wanting the best rate, but still wishing to maintain FDIC insurance. In reviewing Franklin's own evidence, specifically the June 30, 1989 Form 10-K filed by Franklin, we find warnings to the investing public such as "[b]rokered deposits ... constitute a significant percentage of the Association's unsecured liabilities," and brokered "[d]eposits ... may be withdrawn from a thrift in the event of availability elsewhere of higher interest-earning investments for such funds." Franklin's Form 10-K explicitly warned investors that its operating strategy had resulted in significant "volatility in the earnings" and was expected to continue to do so in the future. Brokered deposits present two problems to a financial institution: first, they tend to increase the cost of funds; and second, they impair the institution's liquidity as most brokered deposits are short term. This means the institution must sell investments in order to obtain the money to pay off the maturing deposits. It is also important to note Congress has condemned reliance on brokered deposits, describing such reliance as "poor management." H.R.Rep. No. 101-54(I), at 299, U.S.Code Cong. & Admin.News 1989, p. 95.
 
 
 66
 The district court ignored the question of whether Franklin unduly relied upon brokered funds. Instead, it focused on Franklin's cost of funds being low and therefore determined that Franklin's reliance upon brokered deposits for over seventy per cent of its total deposits was neither unsafe nor unsound. In so doing, the district court disregarded Director's concerns and his expert judgment. The district court in effect substituted for the judgment of Director, as to what constitutes undue reliance upon brokered deposits, the judgment of Franklin's experts, thus failing to give any deference to Director's knowledge, expertise and judgment. Even if the trial court was correct in its finding that "Franklin was able to set an interest rate significantly under the market and consistently obtain brokered deposits at that below market rate," Franklin II at p 173, it did so by ignoring the agency file containing Director's specific comparisons. Further, the district court completely ignored and failed to address the liquidity problems presented by Franklin's significant reliance upon these brokered deposits.
 
 
 67
 The fact that over seventy per cent of Franklin's deposits were brokered is clearly established in the agency record and is undisputed by Franklin. Director found this to be an unacceptable level or concentration of brokered deposits for a savings and loan association. Moreover, Congress has condemned such high reliance on brokered funds. Franklin presented experts who testified, in essence, that Franklin's reliance upon this level of brokered funds was acceptable. However, such contradictory expert testimony from a competing witness is not sufficient to allow a reviewing court to conclude the agency action was arbitrary, capricious, or an abuse of discretion, nor is it sufficient to overcome the presumption of correctness. Overton, 401 U.S. at 415, 91 S.Ct. at 823; Guaranty Sav., 794 F.2d at 1432.
 
 
 68
 When Director made the decision that reliance upon brokered funds for seventy per cent of total deposits was an unsafe or unsound condition, Director was making first, a policy decision, i.e., seventy per cent of total deposits being brokered is an unacceptable level, and second, a predictive judgment, i.e., Franklin had created an unacceptable level of risk for the depositors' funds. Substantial evidence existed to support this decision.
 
 
 69
 As discussed above, Director found Franklin was in an unsafe and unsound condition due to its significant level of high-risk assets and its undue reliance upon brokered deposits. Up to this point we have discussed Franklin's high concentrations of high-risk assets and brokered deposits, finding the administrative record clearly establishes both exist. We must still determine if the agency record justifies a finding these concentrations rendered Franklin's condition unsafe and unsound. What constitutes an unsafe and unsound condition is somewhat of an amorphous concept, as it varies depending on the circumstances involved. It is clear, however, that an unsafe or unsound condition exists where a financial institution is operated in such a manner as to cause unacceptable levels of risk to its depositors' funds. Since a particular condition may not necessarily be unsafe or unsound in every circumstance, it must be judged in relation to all relevant facts. One of the clear purposes of FIRREA is to commit the progressive definition and eradication of such conditions to the director. First Nat'l Bank of Lamarque v. Smith, 610 F.2d 1258, 1265 (5th Cir.1980). Whether a financial institution is in an unsafe or unsound condition is largely a predictive judgment (i.e., what may happen if this practice continues), and reviewing courts should be particularly deferential when they are reviewing an agency's predictive judgments, especially those within the agency's field of discretion and expertise. As we have pointed out, the role of a reviewing court is to determine whether the director's action was within his authority, was based upon a consideration of valid factors, and whether a clear error of judgment has occurred. See 5 U.S.C. Sec. 706(2). In reviewing the director's decision to appoint a conservator, courts need not slavishly follow the director's decision. Rather, it is the function of the reviewing court to determine whether there is substantial evidence to support the statutory grounds of appointment. Here, such evidence clearly exists. Reliance by the district court upon one expert to the exclusion of another is insufficient to overcome the deference due Director's appointment decision. A contrary ruling would effectively strip Director of his regulatory and enforcement powers and place this authority in the hands of the savings and loan association.
 
 B. Depletion of Capital
 
 70
 The second statutory ground for the appointment of a conservator Director found to exist was under 12 U.S.C. Sec. 1464(d)(2)(A)(vii), which allows for the appointment of a conservator if the director finds: "[T]he association has incurred or is likely to incur losses that will deplete all or substantially all of its capital, and ... there is no reasonable prospect for the replenishment of the capital ... without Federal assistance...."
 
 
 71
 The administrative record reveals an abundance of evidence supporting Director's decision concerning the likelihood of depletion of Franklin's capital. Franklin's net income margin had steadily and progressively declined from 2.34 per cent as of June 30, 1984 to .94 per cent on June 30, 1989. Franklin, by its figures, had a $9 million loss from June 30, 1988 to June 30, 1989. Franklin was paying dividends and large bonuses notwithstanding the loss. During 1988 and 1989, after being ordered to stop growing, Franklin nevertheless continued an aggressive growth rate in its assets (22.3 per cent) while its capital was decreasing. Franklin was also unsuccessful in obtaining outside capital. Nonetheless, for its fiscal year ending June 30, 1989, Franklin paid its eight executive officers $3.5 million in cash compensation and paid its owners dividends of $15 million. It "pumped up" its capital by $120.7 million with an unauthorized tax forgiveness agreement between it and its holding company. Franklin's core capital was only 2.1 per cent on November 30, 1989, after an adjustment for the tax forgiveness contract. Director deemed this a clear capital failure. While this finding was sufficiently dire itself, Director also noted his deep concern regarding Franklin's deferral of actual cash losses, which understated its current losses. By June 30, 1989: the deferred hedging losses were approximately $374 million, of which Director ordered $127 million be taken immediately; Director had significant evidence that the entire economic value of Franklin was only $70 million; Director was concerned that Franklin ran the risk of default on the bonds Franklin had issued having a face value of $2.9 billion, but which could cost Franklin $185 million to defease the possible default; and Director felt Franklin should increase its valuation loss allowances to $49 million as a result of expected losses on its letters of credit. In sum, Franklin reported its capital to be $380 million, although Director felt there should be write-offs of $472 million. Under Director's most optimistic view Franklin had a net worth of only $70 million, falling well short of the capital requirements. Director believed there was no profit in Franklin's future; Franklin was only marginally profitable in one of the past five quarters; any gains on assets would be offset by future losses; Franklin was unable to restructure its portfolio to obtain profitability; and while the holding company had forgiven $110 million in deferred taxes, Franklin remained liable to the IRS and the holding company did not appear to have the resources to pay the taxes. Based on these and numerous other factors, Director concluded Franklin could not, in the foreseeable future, meet its capital requirements.
 
 
 72
 After hearing from both Franklin's and Director's expert accountants, the district court determined that although Franklin's methods of accounting for future losses was not widely used, Franklin II at 109, Franklin's deferral of its hedging losses was in accordance with GAAP, id. at p 110, and had been approved by Franklin's outside auditors, id. at p 111. The district court further determined Franklin's use of its "absolute value method" was a reliable method of testing correlation which was the keystone justifying Franklin's accounting deferral of its actual cash hedging losses, id. at p 128; Franklin's computer modeling of future losses was an accurate basis upon which to defer these losses, id. at p 189; and that it generally approved of the accounting methods of Franklin.
 
 
 73
 In making these findings, the trial court again rejected Director's expertise and experience and accepted the judgments and opinions of Franklin's experts in this eighteen-day de novo bench trial. The district court found that even though Director's accounting standards were within GAAP, it would apply Franklin's accounting standards as Director's were too conservative.
 
 
 74
 Director had ordered Franklin to increase its loan loss valuation by $47 million to cover future losses expected to arise from Franklin's letters of credit. The trial court simply decided Director failed to properly evaluate this expected loss as Director did not give weight to the fact that Franklin would provide favorable financing to those who purchased the properties at the foreclosure sales. The trial court substituted this predictive judgment of Franklin's expert for that of Director. Even if we assume the district court was correct in decreasing the amount of this expected loss due to the possibility of favorable financing, the district court was not correct in deciding there would be no loss. At the very minimum there would be a decrease in earnings.
 
 
 75
 Director had ordered Franklin to increase its loan loss reserve by $185 million to account for predicted expenses necessary to defease a possible default in Franklin's bonds. The district court found default had not occurred and "was not an event likely to occur." Franklin II at p 157. Again, this finding was based on the court's substituting the predictive judgments of Franklin's experts for those of Director.
 
 
 76
 Following Franklin's unauthorized entry into a tax forgiveness agreement with its holding company--a device Franklin had used to increase its capital--Director ordered Franklin to write down its capital $110 million. Director reasoned that Franklin was still responsible to the IRS for the taxes and, in any event, the holding company lacked the ability to pay. Notwithstanding Director's reasoned analysis, the trial court found no taxes were due at the time the conservator was appointed, and the holding company did have the ability to pay any tax that might come due in that it could borrow the money, sell stock, or liquidate Franklin. Franklin II at p 165. These findings were again in disregard of Director's judgment and analysis. We feel compelled to observe that Franklin's holding company had virtually no assets except Franklin's stock and a small cash account.
 
 
 77
 When reviewing an agency's decision concerning matters lying within the agency's field of expertise, a reviewing court should begin by acknowledging that a presumption of procedural and substantive regularity attaches. Overton, 401 U.S. at 415, 91 S.Ct. at 823; Guaranty Sav., 794 F.2d at 1432. The reviewing court, particularly when reviewing such technical determinations and predictive judgments, must apply a deferential standard of review. Reliance on testimony of one competing expert to the exclusion of another is insufficient to overcome the presumption of correctness that the agency enjoys in its particular area. This presumption is even stronger where Congress has charged an agency with complex analytical responsibilities and the duty to make predictive judgments.
 
 
 78
 This does not mean all agency decisions are unimpeachable. A reviewing court should not blindly follow an agency decision. In the instant case, it is the responsibility of the reviewing court to determine if there is substantial evidence in the director's administrative file to support a finding of the existence of one of the statutory grounds for appointment of a conservator. A director's decision to appoint a conservator when based upon technical matters such as: unacceptable levels of high-risk assets and acceptable levels of liabilities; accounting standards; the level of loan loss reserves; and predictions of future losses, should not be set aside by the reviewing court unless the findings transgress the bounds of reason.
 
 
 79
 In reviewing Director's decision to appoint a conservator, we need only inquire whether this decision had a rational basis as shown by the administrative record. The focus of this inquiry is whether a statutory ground for the appointment of a conservator existed at the time the decision was made. The inquiry should not focus on credibility determinations as to which experts are more persuasive or which have the better analytical and predictive abilities. We find Director's second statutory ground upon which he based his decision is fully supported in the administrative record and provided a valid basis for the appointment decision.
 
 
 80
 C. Substantial Dissipation of Assets or Earnings
 
 
 81
 The third statutory ground for the appointment of a conservator that Director found to exist is contained in 12 U.S.C. Sec. 1464(d)(2)(A)(viii), which allows for the appointment of a conservator or receiver if "there is a violation or violations of laws or regulations, or an unsafe or unsound condition which is likely to cause either insolvency or substantial dissipation of assets or earnings, or is likely to weaken the condition of the association or otherwise seriously prejudice the interests of its depositors."
 
 
 82
 Much of Director's evidence concerning capital depletion is also applicable to this statutory ground and need not be repeated. It is nevertheless appropriate to discuss briefly some of the remaining factors underpinning Director's finding.
 
 
 83
 The proper amount of capital is essential to the continued operation of any financial institution. Director's evidence established the probability of future capital inadequacy, yet the district court found that Franklin had the means to comply with all capital requirements.
 
 
 84
 We first examine Director's evidence. Franklin's net interest margin had been steadily shrinking, and in fact was negative in three of its last four quarters. In its fiscal year 1988-89, Franklin reported a net loss of $9 million. Franklin's operating trends revealed Franklin was likely to experience additional losses in the foreseeable future. In short, Franklin was unable to generate capital through earnings. Moreover, it was highly unlikely that Franklin could raise outside capital. Franklin II at p 52. Presumably its ownership was unable or unwilling to inject any additional capital of its own. Director opined that in light of Franklin's poor operating results and negative trends its recent aggressive and significant growth was not prudent and the institution was unable to provide the necessary capital to support such growth.
 
 
 85
 In order that Director could be assured of capital adequacy, Director ordered certain adjustments to capital. These adjustments included: (1) a $119 million write-down in order that the capital would accurately reflect hedging losses that Franklin had deferred (this also had the effect of understating current losses); (2) a $47 million write-down to accurately reflect a valuation allowance in loss reserves, and to accurately reflect the amount of losses Director predicted Franklin would incur as a result of letters of credit Franklin had issued guaranteeing payment of various industrial revenue bond issues; (3) a write-down of $185 million to provide an allowance to assure Franklin's $2.9 billion zero coupon bonds; (4) a write-down of $110 million to accurately reflect an unauthorized tax forgiveness agreement between Franklin and its holding company, which resulted in an increase in Franklin's stated capital; and (5) as Franklin had included in its capital investment Sun Life Insurance Company's purchase of a block of insurance policies, Director ordered a write-down of $33 million, which was included in Franklin's capital as a part of its supervisory goodwill.
 
 
 86
 A summary of Director's concerns about Franklin's lack of capital is simple. On June 30, 1989, Franklin reported its total capital requirements as being $274 million. Franklin's own Form 10-K report explicitly states:
 
 
 87
 Unless the Association significantly increases its capital, reduces its investments in an extension to such subsidiaries, or restricts the impermissible activities of such subsidiaries, on a fully phased-in basis this new requirement for calculating capital could have a material adverse effect on the Association's capital.
 
 
 88
 This Form 10-K also contains many warnings to potential investors that Franklin's capital structure may become inadequate.
 
 
 89
 Again we look at the district court's treatment of Director's concerns about Franklin's capital structure. The court found, based upon Exhibit 603, that Franklin had the ability to comply with all regulatory capital requirements through transactions already scheduled to occur. Franklin II at p 84. The district court then determined the investment in Franklin's Saver's Life subsidiary was properly included in its capital. Id. at p 86. It further found no write-down was necessary to properly reflect current losses on Franklin's hedging as Franklin used the better accounting standards. It determined Director had wrongfully valued the expected losses from Franklin's letters of credit in that Director failed to take into account the value of Franklin's financing of the anticipated buyers of these foreclosed properties. Id. at p 154. The court determined Director's prediction of the moneys needed to avoid default upon the bond issue was incorrect, id. at pp 155-158, and that it was acceptable for Franklin to apply the tax forgiveness to its capital, id. at pp 159-168.
 
 
 90
 To reach these results the district court had to ignore the evidence contained in the administrative record and accept without question Franklin's competing evidence. The district court furthermore had to ignore or disregard Director's predictive judgments and completely accept all the testimony given by Franklin's experts. Finally, the district court had to reject Director's accounting standards and adopt Franklin's. While both competing accounting standards were in accordance with GAAP, the district court failed to give the appropriate deference to the standards specified by Director, stating only that Director's standards were "extremely conservative." Id. at p 101. Basically, the district court found Director's decisions arbitrary based upon competing expert testimony and gave no deference whatsoever to Director's expertise and predictive judgments.
 
 
 91
 The proper inquiry under the arbitrary and capricious standard is not which expert is more impressive, or even if the reviewing court agrees with a particular view over another. Rather, the appropriate inquiry of the reviewing court is whether a reasonable person considering the matters on the agency's table could find a rational basis to arrive at the same judgment as made by the director.
 
 
 92
 Reviewing the evidence contained in the administrative file and giving Director's predictive judgments due deference, we find: the decision to appoint a conservator supported by substantial evidence; the evidence clearly establishes the existence of the statutory grounds for the appointment of a conservator; and Director's conclusions were reasonable.
 
 IV.
 Franklin's Cross-Appeal
 
 93
 Franklin appeals the portion of the district court's judgment that holds Mr. Wall had authority as a de facto officer to appoint a conservator for Franklin.
 
 
 94
 The district court held Mr. Wall was unconstitutionally appointed to serve as director of the Office of Thrift Supervision. See Franklin Sav. Ass'n v. Director of Office of Thrift Supervision, 740 F.Supp. 1535, 1541 (D.Kan.1990). We need not decide the correctness of this determination as it has not been appealed.
 
 
 95
 The district court, applying the doctrine of de facto officer, ruled that when governmental action is challenged on the ground the official taking the action was improperly in office, the challenged acts will be upheld in the interests of the public. Id. Franklin concedes the existence of this legal principle yet urges us to refuse to adopt and apply the de facto officer doctrine as doing so would subvert adherence to the Appointments Clause, citing Andrade v. Lauer, 729 F.2d 1475 (D.C.Cir.1984), in support of its position.
 
 
 96
 We previously have been invited to reject the de facto officer doctrine and declined. Horwitz v. State Board of Medical Examiners, 822 F.2d 1508, 1516 (10th Cir.), cert. denied, 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 394 (1987). In Andrade, the court held that a specific, focused attack on a particular agency action (i.e., termination of plaintiffs' employment with the agency) would be permitted when the agency had actual notice of the claimed appointment defect and suit was filed promptly. 729 F.2d at 1500. The Andrade court made clear its holding would not be mechanically applied but it would require courts to pay "due attention to equitable factors." Id. We are not persuaded Andrade requires a result contrary to that reached. Moreover, we find Horwitz precludes its application to the facts of this case.
 
 
 97
 The district court found that notwithstanding Mr. Wall's defective appointment, it would exercise its remedial discretion to uphold Mr. Wall's appointment of a conservator to Franklin. Franklin, 740 F.Supp. at 1542; see also Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (refusing to invalidate past acts of the Federal Election Commission despite the Court's finding that the commission's appointments violated the Appointments Clause). Franklin contends this was not an appropriate case for the court to exercise its remedial discretion and power. We disagree. Equitable remedies are within the sound discretion of the trial court. Buckley, 424 U.S. at 142, 96 S.Ct. at 693; Andrade, 729 F.2d at 1499 n. 39. Franklin has failed to persuade us the trial court abused its discretion by its ruling.
 
 Conclusion
 
 98
 A review of the administrative file clearly reveals a high-flying,[9] debt-laden, troubled savings and loan. The record reveals the owners diverting millions of dollars into their pockets through large salaries, bonuses and dividends, notwithstanding the losses being incurred by the association. The record reveals a financial institution taking what the director deemed to be unacceptable risks with its depositors' monies. In fact, the record reveals a financial institution both unable and unwilling to comply with the director's requirements relating to safety and soundness concerns.
 
 
 99
 The ultimate question underlying this dispute is: Who is vested with the responsibility for determining the quality of assets, the proper levels and types of assets and liabilities, appropriate accounting standards, and the numerous other questions relating to the safe and sound condition of a financial institution? Congress has answered this question by enacting FIRREA, which clearly vests this responsibility in the director.
 
 
 100
 The district court first improperly expanded its scope of review as it allowed testimony by Franklin's experts giving opinions on such matters as acceptable levels of brokered deposits and high-risk assets. Secondly, the district court erred by improperly applying the standard of review when it accepted such expert opinion. By so doing, the district court effectively usurped Director's regulatory and enforcement powers and placed these powers into the hands of Franklin. Congress has given the director, not the courts, the power to define what is an unsafe and unsound condition.
 
 
 101
 We have reviewed the agency record utilizing the arbitrary and capricious standard of review. Our review persuades us Director's decision was not arbitrary, capricious or an abuse of discretion. The decision was supported by substantial evidence and is in accordance with the applicable law.
 
 
 102
 Accordingly, the decision of the district court is REVERSED and VACATED. This matter is REMANDED to the district court with instructions to dismiss the action.
 
 
 
 [1]
 A mortgage-backed security is a security that entitles the holder to share in the payments (cash flow) from a fixed pool of mortgage loans
 
 
 [2]
 The plain language of this statute limits those who may request relief from action taken to the association. We note the appearance, as a party, of Franklin Savings Corporation, which is the holding company of Franklin Savings Association. The parties have not raised this issue, and as it is not necessary to our decision, we decline to address it
 
 
 [3]
 The decision of the district court, ruling upon the motions for summary judgment in this case, is published in Franklin Sav. Ass'n v. Director of Office of Thrift Supervision, 740 F.Supp. 1535 (D.Kan.1990). The district court's later ruling upon the standard of review and merits of the case is found at 742 F.Supp. 1089 (D.Kan.1990). This later decision will be referred to as Franklin II
 Throughout this opinion, when referring to the district court's opinion in Franklin II, we will cite to paragraph numbers when provided in that opinion.
 
 
 [4]
 Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183-553 (1989) (codified at 12 U.S.C. Sec. 1461 et seq.)
 
 
 [5]
 The Fifth and Eighth Circuits have reached this same conclusion that the language "upon the merits" in a statute does not define the scope of judicial review. These courts have found the absence of a scope of review when examining identical language (i.e., requiring a court to review action of appointing receiver "upon the merits") used in the Home Owner's Loan Act of 1933, 12 U.S.C. Sec. 1461 et seq. See Woods v. FHLBB, 826 F.2d 1400, 1406 (5th Cir.1987), cert. denied, 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988); Guaranty Sav. & Loan Ass'n v. FHLBB, 794 F.2d 1339, 1342 (8th Cir.1986)
 
 
 [6]
 We discuss 5 U.S.C. Sec. 706(2)(F) infra at 1141-1142, n. 7, which provides for de novo review in certain limited circumstances
 
 
 [7]
 5 U.S.C. Sec. 706(2)(F) of the APA has been interpreted as authorizing de novo review in two instances: (1) when the action is adjudicatory in nature and the agency's fact-finding procedures inadequate; and (2) when issues not previously before the agency are raised in a proceeding to enforce a nonadjudicatory action. Overton, 401 U.S. at 415, 91 S.Ct. at 823. However, neither situation exists in the case before us. Congress does not require the director to hold a hearing when making a determination as to whether a statutory ground for appointment exists; rather, the intent of Congress was to entrust the director with a vast amount of control and authority in regulating the savings and loan associations. See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 159-67, 102 S.Ct. 3014, 3025-30, 73 L.Ed.2d 664 (1982); Woods, 826 F.2d at 1406; Alliance Fed. Sav. & Loan Ass'n v. FHLBB, 782 F.2d 490, 493 (5th Cir.1986). We find the actions of Director in this case were made with adequate factual support, which was included in the administrative record. See Camp, 411 U.S. at 141-42, 93 S.Ct. at 1243-44 (fact-finding procedures used by Comptroller of the Currency not deficient). The second situation described in Sec. 706(2)(F) clearly does not apply as the proceeding in the instant case was not brought to enforce Director's action but to nullify it
 
 
 [8]
 We note the above is a summary; however, the administrative record reflects it to be accurate. We also note the administrative record contains significant quantities of data supporting these conclusions
 
 
 [9]
 Franklin has numerous subsidiaries which in turn had subsidiaries which in turn had at least one subsidiary. Some were engaged in the insurance business and some were broker-dealers. One, L.F. Rothschild & Co., Inc., filed for Chapter 11 protection after incurring a $1.2 billion loss in its 1987-88 fiscal year. It attempted to purchase a Beverly Hills savings and loan and was stopped by Director