**FRANKLIN SAVINGS
CORPORATION,
Plaintiff,**

v.

**OFFICE OF THRIFT SUPERVISION,
Defendant.**[1]

No. 95–2039–JWL.

United States District Court,
D. Kansas.

Jan. 12, 2004.

1.  Franklin Savings Association and the United States of America were once parties to the counterclaim aspect of this case. As explained later, however, that counterclaim was transferred to the Court of Federal Claims. Thus, the only parties remaining before this court are Franklin Savings Corporation and Office of Thrift Supervision.

Jonathan A. Margolies, R. Pete Smith, McDowell, Rice, Smith & Gaar, Kansas City, MO, for Plaintiff.

Anne L. Weismann, Arthur R. Goldberg, John T. Stemplewicz, James J. Faughnan, Jeffrey Axelrad, U.S. Department of Jus-

tice, J. Amanda Machen, Martin Jefferson Davis, Office of Thrift Supervision, Washington, DC, Christopher Allman, Office of United States Attorney, Kansas City, KS, for Defendants.

Richard D. Ralls, Farchmin Ralls Wagoner, P.C., Kansas City, MO, for Movant.

## MEMORANDUM AND ORDER

LUNGSTRUM, Chief Judge.

This adversary proceeding was withdrawn from the Chapter 11 bankruptcy of plaintiff Franklin Savings Corporation ("FSC"). Defendant Office of Thrift Supervision (the "OTS") filed a proof of claim in the bankruptcy proceeding and FSC objected to that proof of claim. The matter is before the court on the parties' cross-motions for summary judgment (Docs. 136 & 137). For the reasons explained below, the court will grant FSC's motion and deny the OTS's motion because FSC's capital maintenance commitment ceased when the OTS appointed a conservator for Franklin Savings Association ("FSA"), because the OTS has failed to raise a genuine issue of material fact regarding whether FSA was capitally deficient on that date, and because even if OTS did have a valid capital deficiency claim against FSA, that claim would not be entitled to priority over the administrative fee and expense claims of FSC's counsel.

## STATEMENT OF MATERIAL FACTS

This case arises from the failure of a state-chartered savings and loan association, FSA. FSC[2] at all relevant times owned more than ninety percent of FSA's stock. FSC, FSA, OTS, the Resolution Trust Corporation ("RTC"), the Federal Deposit Insurance Corporation ("FDIC"), and the federal government have a history of extensive, protracted, and contentious litigation during the past fourteen years. Suffice it to say that the court is familiar with their history.[3] For purposes of the

---

2. FSC is the successor to Franklin Financial Corporation ("FFC"). The distinction between the two is, however, immaterial for purposes of the parties' motions. Therefore, the court will simply refer to both FFC and FSC as FSC.

3. The parties' litigation history began with an unsuccessful challenge to the OTS's appointment of the RTC as conservator for FSA, see generally Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 742 F.Supp. 1089 (D.Kan. 1990) (ruling the appointment of the conservator was improper), rev'd, 934 F.2d 1127 (10th Cir.1991) (reversing the district court), cert. denied, 503 U.S. 937, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992); see also Franklin Sav. Ass'n v. Office of Thrift Supervision, 150 B.R. 61 (D.Kan.1993) (denying OTS its costs in the case), aff'd, 31 F.3d 1020 (10th Cir.1994), followed by an unsuccessful challenge to the OTS's replacement of the conservator with the RTC as receiver, see generally Franklin Sav. Ass'n v. Office of Thrift Supervision, 821 F.Supp. 1414 (D.Kan.1993) (holding the OTS's replacement of the conservator with the RTC as receiver was not subject to judicial review), aff'd, 35 F.3d 1466 (10th Cir.1994).

Then, the RTC and its successor, the FDIC, sued certain former directors and officers for their alleged mismanagement of FSA. See generally RTC v. Fleischer, 890 F.Supp. 972 (D.Kan.1995); RTC v. Fleischer, 880 F.Supp. 1446 (D.Kan.1995); RTC v. Fleischer, 848 F.Supp. 917 (D.Kan.1994); RTC v. Fleischer, 826 F.Supp. 1273 (D.Kan.1993). The RTC and FDIC were unsuccessful, and the defendants who prevailed were awarded their attorneys' fees. See generally Fleischer v. FDIC, 70 F.Supp.2d 1238 (D.Kan.1999) (holding the FDIC in its capacity as receiver for FSA was required to indemnify the prevailing former directors and officers). FSC likewise sued the United States, the RTC, and the FDIC for their alleged mismanagement of FSA. This challenge also failed. See generally Franklin Sav. Corp. v. United States, 970 F.Supp. 855 (D.Kan.1997) (dismissing FSC and FSA's claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680, and the Administrative Procedure Act, 5 U.S.C. §§ 551–551, 701–706), aff'd, 180 F.3d 1124 (10th Cir.), cert. denied, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999); see also Franklin Sav. Corp. v. United States (In re

parties' cross-motions for summary judgment in this case, the court need not recount that extensive history here, but instead will endeavor to focus on the issues currently before the court.

In 1980, FSC acquired General Savings Association ("GSA") and merged GSA into FSA, FSC's thrift subsidiary. FSC could not lawfully complete the acquisition and merger without obtaining approval from the Federal Savings and Loan Insurance Corporation ("FSLIC"). Therefore, FSC applied to FSLIC to obtain the required approval. At that time, the Federal Home Loan Bank Board ("FHLBB") was the operating head of FSLIC. FHLBB approved FSC's application, but its approval was conditioned on the following:

> [FSC] shall stipulate to [FSLIC] that so long as [FSC] controls [FSA], [FSC] will cause the net worth of [FSA] to be maintained at a level consistent with that required of institutions insured twenty years or longer by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, as now or hereafter in effect, infusing sufficient additional equity capital to effect compliance with such requirement whenever necessary.

In order to satisfy this condition, on December 15, 1980, FSC's president provided a written affidavit to FSLIC that contained the following:

> [S]o long as [FSC] controls FSA[,][FSC] will cause the net worth of FSA to be maintained at a level consistent with that required of institutions insured twenty years or longer by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, as now or hereafter in effect, infusing sufficient additional equity capital to affect [sic] compliance with such requirement whenever necessary.

OTS is the successor to FHLBB and FSLIC.

In late 1984, FSA issued $2.9 billion in bonds for approximately $68 million in cash. The bonds provided that they would be in default if FSA failed to meet its regulatory capital requirements. In the event of a default, FSA would be required to purchase certain United States treasury or agency obligations in an amount that would pay off the bonds at maturity. Quite simply, if such a default were to occur, FSA would suffer millions of dollars of loss by virtue of these purchasing obligations.

In 1985, the regulatory capital rules changed. Under the new rules, federally insured thrift institutions such as FSA were required to have three percent capital in place. An institution with inadequate capital was required to make up the shortage over a five-year period. FSA's management developed a plan to provide FSA with an additional capital cushion to prevent a default under the bond indenture. FSA filed consolidated federal income tax returns with FSC. FSC and FSA planned to enter into certain tax reimbursement and forgiveness agreements. The essence of those agreements would be that FSA would transfer deferred income tax liability to FSC, then FSC would "for-

*Franklin Sav. Corp.),* 296 B.R. 521 (Bankr. D.Kan.2002) (dismissing FSC and FSA's subsequent FTCA claims based on res judicata principles).

The officers of FSA unsuccessfully sought to recover postconservatorship compensation and severance pay. *See generally Fleischer v. RTC,* 882 F.Supp. 1010 (D.Kan.1995), *aff'd,* 113 F.3d 168 (10th Cir.1996). Also, the RTC, as receiver for FSA, unsuccessfully sought to impose a constructive trust on certain tax refunds to FSC. *See generally Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.),* 159 B.R. 9 (Bankr.D.Kan.1993), *aff'd,* 182 B.R. 859 (D.Kan.1995).

give"[4] FSA for this tax liability, thus creating a capital contribution to FSA.

Deferred income taxes is an accounting concept involving temporary differences between the financial reporting basis and the actual tax basis of a company's assets and liabilities. FSA had deferred income taxes because its books reflected a liability to FSC for income taxes it would have owed under generally accepted accounting principles ("GAAP"), but the actual amount it paid to FSC for its share of the consolidated tax obligation was the amount it owed under tax laws. Because the amount of the obligation to FSC under GAAP exceeded the amount FSA owed to the IRS under tax laws, FSA's books reflected a liability to FSC for the difference, which represented the GAAP computation of deferred income taxes.

FSA's board of directors approved the proposed tax forgiveness transaction. FSA submitted the plan to the FHLBB for approval. The FHLBB advised FSA's president to determine whether FSA's independent auditors would approve the plan and, if so, to submit the request in writing to the FHLBB. FSA's president did so, and FSA's independent auditor, Deloitte Haskins & Sells, opined that the plan would in fact increase FSA's capital under GAAP. On December 11, 1985, FSA's president submitted the auditor's opinion and a request for approval of the contemplated tax transactions to the FHLBB. The FHLBB never responded to the request for approval.

In 1987 and 1988, FSC and FSA entered into the tax reimbursement and forgiveness agreements. As a result, approximately $120 million of FSA's deferred taxes were transferred to FSC's books, resulting in a $120 million increase in FSA's paid-in capital account. Ultimately, these tax forgiveness transactions provided FSA with a capital cushion that was sufficiently adequate to keep the bonds from going into default.

In 1989 and early 1990, the propriety of the tax forgiveness transactions came under scrutiny by government regulators. These regulators contended the transactions were improper because FSA still remained jointly and severally liable for those deferred taxes if and when they came due. In April of 1989, David Martens, Chief Accountant of the Federal Home Loan Bank System's Office of Regulatory Activities, wrote to FSC's auditor and stated: "In our opinion this transaction is an inappropriate way to increase capital of a thrift." This letter was not based on an official policy or regulation, and the letter did not assert that the transaction was contrary to GAAP principles. In a letter dated January 9, 1990, Louis V. Roy of the OTS stated in a letter to FSA's board of directors that FSA's reported capital was overstated by $110.4 million because of the tax forgiveness transaction. OTS directed FSA to essentially reverse the tax forgiveness transactions and re-establish the deferred taxes as a liability.

On January 10, FSA advised the OTS that doing so would cause a capital failure under FSA's 1984 bond issue and would cost FSA $185 to defeasance the bond debt. On January 11, the OTS informed FSA that it would reconsider its January 9 directive requiring FSA to re-establish the deferred tax liability on its books. On January 15, FSA responded to an earlier request from the OTS for more specific

---

4. FSC contends that it actually forgave FSA for that tax liability, whereas OTS contends that FSC only purported to forgive FSA for that tax liability. The court is well aware of the parties' dispute regarding this characterization, but it will, for the sake of simplicity, refer to the transaction in terms of forgiveness, rather than purported forgiveness.

information regarding the tax forgiveness transactions. On January 23, Mr. Roy again wrote to FSA, this time directing FSA to hold the January 9 supervisory directive in abeyance until the OTS fully reviewed the additional information FSA submitted regarding the tax forgiveness transactions.

FSA took the position that the tax forgiveness transactions were in accordance with GAAP because the deferred taxes would in all likelihood never become due. For the years 1985 through 1988, FSA reported the tax forgiveness transactions to the FHLBB without objection from the FHLBB. It also disclosed the additional capital generated by the tax forgiveness transactions in its audited financial statements for 1985 and 1986. The audited financial statements that FSA filed with the FHLBB for fiscal years ended June 30, 1987, June 30, 1988, and June 30, 1989, reflected the additional capital generated by the tax forgiveness transactions. The FHLBB and the OTS examined FSA for years, including examining all transactions with FSC, and including an examination of the tax forgiveness transactions.

On February 15, 1990, the OTS appointed the RTC as conservator for FSA based on safety and soundness allegations "other than a failure to meet capital standards," and "not for the purpose of liquidation." On February 16, 1990, in a securities Form 8–K, the RTC reported a "change in control of the registrant" on behalf of FSA. This Form 8–K stated:

> By operation of law the RTC, as conservator for the registrant, succeeded to all rights, titles, powers, and privileges of the registrant and of any stockholder, accountholder, depositor, officer, or director of the registrant with respect to the registrant and the assets of the registrant. Accordingly, the individual directors of the registrant, and the board of directors of the registrant as a whole, have no power to control the management of the registrant or to direct the business and affairs of the registrant.

> The RTC as conservator for the registrant will operate the registrant in the registrant's name. The business of the registrant will continue without interruption under the direction of RTC as conservator.

In another Form 8–K dated March 15, 1990, the RTC stated that the [Report of Examination conducted between October 16, 1989, and January 9, 1990, by the OTS] states that [FSA's] recording of additional paid-in capital as a result of the forgiveness of debt by FSC is in accordance with generally accepted accounting principles."

At the close of business on March 15, 1990, the RTC made some changes to FSA's books. One of those changes, which was made pursuant to a March 9, 1990, directive from the OTS, was that $110.4 million in deferred tax liability was re-established on FSA's books by essentially reversing the tax forgiveness transaction. RTC made these changes to the books effective as of January 1990. It is undisputed that FSA had adequate capital with the tax forgiveness transaction in place, but that a capital deficiency resulted when the conservator essentially reversed the transaction and re-established the deferred tax liability on FSA's books.

On July 26, 1991, FSC filed a Chapter 11 bankruptcy petition. Since that time, FSC has managed the property and affairs of its bankruptcy estate as a debtor-in-possession. It is undisputed that at all times the bankruptcy estate has consisted of insufficient assets to satisfy any deficiency that existed pursuant to the capital maintenance commitment.

On July 16, 1992, the OTS replaced the conservator with the RTC as receiver to liquidate FSA's assets.

OTS filed a timely proof of claim against FSC in the bankruptcy proceeding, citing 11 U.S.C. §§ 365(o), 507(a)(1) and seeking $271,771,670 as the deficit caused by FSC's alleged breach of the capital maintenance commitment. FSC objected to the proof of claim and filed a takings counterclaim under the Fifth Amendment of the United States Constitution. *See* U.S. Const. amend. V. The bankruptcy court recommended that this court withdraw the adversary proceeding. *Franklin Sav. Corp. v. Office of Thrift Supervision (In re Franklin Sav. Corp.)*, No. 91–41518–11, Adversary Nos. 92–7154 & 93–7001, 1994 WL 114652, at *1–*5 (Bankr.D.Kan.1994). This court did so (Doc. 3), allowed FSA to join in FSC's counterclaim as a counterclaim plaintiff, *Franklin Sav. Corp. v. Office of Thrift Supervision*, No. 95–2039–GTV, 1997 WL 94242, at *1 (D.Kan. Feb.28, 1997), and referred the counterclaim to the Court of Federal Claims, *Franklin Sav. Corp. v. Office of Thrift Supervision*, 213 B.R. 596 (D.Kan.1997).[5] Thus, the only aspect of the case remaining before this court is the OTS's proof of claim and FSC's objections to that proof of claim. *Id.* at 602–03 (clarifying that this court did not transfer the OTS's proof of claim and FSC's objection to the Court of Federal Claims).

FSC and the OTS have filed cross-motions for summary judgment. FSC moves for summary judgment on the basis that the court should deny the OTS's claim entirely because FSC's capital maintenance commitment required FSC to maintain FSA's capital only as long as FSC controlled FSA, because FSC lost control of FSA when the OTS appointed the RTC as conservator of FSA on February 15, 1990, and because FSA was not capitally deficient on that date. OTS, on the other hand, moves for summary judgment on the basis that 11 U.S.C. § 365(o) requires the maximum cure possible of the capital maintenance deficit that existed on the date FSC filed bankruptcy on July 26, 1991. OTS argues the "immediate cure" obligation in § 365(o) comes ahead of and must be satisfied before the administrative fee and expense claims made pursuant to 11 U.S.C. § 503 may be paid, and therefore the court must order FSC's bankruptcy counsel to return all interim fee and expense payments to the bankruptcy estate and prohibit any further such payments.

## SUMMARY JUDGMENT STANDARD[6]

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th

---

5. The Court of Federal Claims dismissed the takings claim. *Franklin Sav. Corp. v. United States*, 46 Fed.Cl. 533 (Fed.Cl.2000) (dismissing FSC's takings claim). It also dismissed claims that FSC and FSA later asserted for breach of contract and breach of fiduciary duty, and it denied reconsideration of the takings claim. *Franklin Sav. Corp. v. United States*, 56 Fed.Cl. 720 (Fed.Cl.2003).

6. Plaintiff and defendant have each filed a motion for summary judgment. The court will address the motions together. The legal standard does not change if the parties file cross-motions for summary judgment. Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *Atl. Richfield Co. v. Farm Credit Bank*, 226 F.3d 1138, 1148 (10th Cir.2000).

Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *see also Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams*, 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## ANALYSIS

For the reasons explained below, the parties are not entitled to rely on the facts recited by the Tenth Circuit in the conservatorship litigation or the bankruptcy court's factual findings in the tax refund litigation in attempting to meet their respective burdens. Further, FSC's capital maintenance commitment ceased when the director of the OTS appointed the RTC as conservator of FSA. The OTS's claim against the estate consists of any capital deficiency that had matured by that date, but the OTS has failed to raise a genuine issue of material fact regarding whether a capital deficiency actually existed on that date. Finally, the court concludes that even if OTS had a capital deficiency claim against the estate, that claim would not be entitled to priority over FSC's bankruptcy counsel's administrative fee and expense claims.

## I. Facts From the Conservatorship Litigation and the Tax Refund Litigation

Both parties rely on prior published opinions in support of their statements of

material fact. Specifically, OTS relies on facts recited by the Tenth Circuit in *Franklin Savings Ass'n v. Director, Office of Thrift Supervision,* 934 F.2d 1127 (10th Cir.1991) [*Franklin I* ], whereas FSC relies on the bankruptcy court's factual findings in *Franklin Savings Corp. v. Franklin Savings Ass'n (In re Franklin Savings Corp.),* 159 B.R. 9 (Bankr.D.Kan.1993) [the "tax refund litigation"]. Neither of these cases, however, establish facts the parties can use to support their respective motions for summary judgment. *See* D. Kan. Rule 56.1(d) ("All facts on which a motion or opposition is based shall be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories and responses to requests for admissions.")

■ To the extent the parties may be attempting to rely on principles of collateral estoppel (*i.e.,* issue preclusion), they are not entitled to do so. Under federal law, collateral estoppel may be invoked only if "the issue previously decided is identical with the one presented in the action in question." *Frandsen v. Westinghouse Corp.,* 46 F.3d 975, 978 (10th Cir. 1995). In *Franklin I,* the court limited its review to the administrative record, the agency was regarded as the finder of fact, the director's findings were entitled to deference, the appointment decision was entitled to a presumption of regularity, and the issue presented was whether the director of the OTS's decision to appoint the conservator was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 934 F.2d at 1136–43. By comparison, this lawsuit does not call for the court to evaluate the propriety of the OTS's appointment of the RTC as conservator, but instead requires the court to evaluate whether FSC retained control of FSA for purposes of the capital maintenance commitment notwith-

standing the OTS's appointment of the RTC as conservator of FSA, as well as whether FSA was in fact capitally deficient on the date the RTC was appointed conservator. Thus, the requisite identity of issues does not exist. Further, giving preclusive effect to the Tenth Circuit's recitation of facts in *Franklin I* would essentially give preclusive effect to the facts underlying the OTS's decision to appoint the RTC as conservator. The OTS, however, was acting in its regulatory, not judicial, capacity when it appointed the RTC as conservator and FSA did not have an opportunity to litigate before the OTS the propriety of the appointment of the RTC as conservator. *See, e.g., United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 421–22, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) (preclusive effect is given to administrative findings only when agency acts in a judicial capacity and parties are given a meaningful opportunity to litigate); *Brockman v. Wyoming Dep't of Family Servcs.,* 342 F.3d 1159, 1166 (10th Cir.2003) (administrative agency must have been acting in a judicial capacity in order for its decision to be given preclusive effect); *Dougherty v. Carver Fed. Sav. Bank,* 112 F.3d 613, 623 (2d Cir.1997) (court would not give preclusive effect to OTS determination because agency was acting in a nonjudicial capacity without the benefit of an adversary hearing). Thus, the facts recited by the Tenth Circuit in *Franklin I* are not entitled to preclusive effect.

■ Similarly, in the tax refund litigation, the bankruptcy court also evaluated different issues than those involved in this case. Specifically, the bankruptcy court evaluated FSA's argument that a constructive trust should be imposed on certain tax refunds received by FSC because FSC breached its fiduciary duty to FSA by acting unfairly or unconscionably in implementing the tax forgiveness plan. 159

B.R. at 29, 33. This tangential relationship with the tax forgiveness plan does not equate to the requisite identity of issues sufficient to invoke collateral estoppel principles. In this case, the only colorable factual dispute is not whether FSC acted improperly toward FSA when it implemented the plan, but rather whether the tax forgiveness transaction actually had the legal effect of increasing FSC's capital.

In sum, the Tenth Circuit's opinion in *Franklin I* and the bankruptcy court's opinion in the tax refund litigation cannot be used to establish any facts for purposes of the parties' cross-motions for summary judgment. Those cases do, however, provide the court with an informative background of the parties' dispute.

## II. Validity of the OTS's Claim Against the Estate

With this preliminary issue resolved, the court will now turn to the substance of FSC's motion for summary judgment. FSC seeks summary judgment on the basis that OTS does not have a valid claim against the estate because (1) FSC's capital maintenance commitment ceased when the OTS appointed the RTC as conservator on February 15, 1990, and (2) FSC had adequate capital on that date. As explained below, the court agrees and concludes that FSC is entitled to summary judgment on these issues.

### A. Impact of the Appointment of RTC as Conservator

■ OTS urges the court to adopt the statutory definition of the term "control" in the change-of-control statute that governed FHLBB's approval of FSC's merger and acquisition of GSA in 1980. In 1980 and at all times since, that statute has defined control to include (in relevant part) ownership of twenty-five percent or more of the voting shares of a subsidiary. 12

U.S.C. § 1467a(a)(2)(A) (previously codified at 12 U.S.C. § 1730a(a)(2)(A)); *see also* 12 C.F.R. § 583.7 (similarly defining control; previously codified at 12 C.F.R. § 583.26). Under this statutory definition of control, FSC would arguably be regarded as having had control of FSA because FSC owned more than ninety percent of FSA's stock at all relevant times. In support of this argument, OTS cites a statement by the Fourth Circuit in a case in which the court was also confronted with the meaning of the word control in a similar capital maintenance commitment:

> [U]nder federal law ... "control" of an institution is defined to include ownership of more than twenty-five percent of the voting shares of that institution. *See* 12 C.F.R. § 583.26(a) (1985); 12 C.F.R. § 583.7(a) (1992); 12 U.S.C. § 1467a(a)(2)(A) (Supp. II 1990). Because Firstcorp owned all of the voting shared in FF–Raleigh, even after the consent agreement it controlled that institution as a matter of law.

*RTC v. Firstcorp, Inc. (In re Firstcorp),* 973 F.2d 243, 250 (4th Cir.1992). At first glance, OTS's argument might have some appeal. Ultimately, though, after analyzing the statutes, regulations, and the Fourth Circuit's opinion in *Firstcorp,* the court is unpersuaded that FSC's ownership of FSA's stock is sufficient to regard FSC as having been in control of FSA for purposes of the capital maintenance commitment notwithstanding the OTS's appointment of the RTC as conservator.

The parties have cited a number of statutes and regulations. Neither party, however, has cited any verbiage to suggest that any of those statutes or regulations defines the term "control" for purposes of the capital maintenance commitment. For example, 12 U.S.C. § 1467a, which is the statute relied upon by OTS, does not by its terms contain any language suggesting

498

that it purports to govern the duration of such capital maintenance commitments. Specifically, it provides that its definition of control is the definition "[f]or purposes of this section." *Id.* This section (*i.e.,* § 1467a) does not include any capital maintenance commitment. Rather, the word "control" in § 1467a is used to define what entities must be regarded as savings and loan holding companies and affiliates. *Id.* § 1467a(a)(1)(D)(i), (a)(1)(E), (a)(1)(H). The statute then requires those savings and loan holding companies to perform certain activities, prohibits them from doing other activities, and requires them to obtain approval of certain new activities such as acquiring control of a savings association (*e.g.,* FSC's acquisition of GSA). *See, e.g., id.* § 1467a(b)-(f), (h). The statute gives the director of the OTS authority to administer and enforce the statute, including the power to investigate, obtain court-ordered injunctions, and issue cease-and-desist orders. *Id.* § 1467a(g). It provides for criminal and civil penalties for violations of the statute or any regulation or order issued pursuant thereto. *Id.* § 1467a(i). It gives the director of the OTS authority to issue directives. *Id.* § 1467a(p)(1). It allows for any party aggrieved by an order or directive to seek judicial review. *Id.* § 1467a(j), (p)(2)(B). In sum, § 1467a accomplishes a lot. Notably, though, it contains no language suggesting that it purports to govern the issue of control for purposes of determining the duration of a capital maintenance commitment. Thus, the definition of control in this statute is relevant to this case only in the sense that it triggered the need for FSC to obtain regulatory approval of the change in control of GSA.

More importantly, though, even if the court were to accept this statute and corresponding regulations as the applicable definition of control, FSC was deprived of its ownership of the stock when the RTC was appointed conservator. The word "own" means "[t]o have good legal title; to hold as property; to have a legal or rightful title to; to possess." Black's Law Dictionary 1105 (6th ed.1990). On February 15, 1990, the RTC succeeded by operation of law to "all rights, titles, powers, and privileges ... of any stockholder." 12 U.S.C. § 1821(d)(2)(E)(i); *see also id.* § 1821(d)(1)(2)(B) (giving the RTC power when it is appointed conservator to "take over the assets of and operate the insured depository institution with all the powers of the ... shareholders"); *id.* § 1464(d)(2)(E) ("A conservator shall have all the powers of ... the stockholders ...."). RTC's Form 8–K similarly reported that the RTC succeeded to "all rights, titles, powers, and privileges, of any stockholder." Thus, upon appointment of the RTC as conservator, FSC no longer possessed good, legal, or rightful title to the stock, and therefore it no longer "owned" its stock in FSA.

This conclusion is consistent with the Fourth Circuit's reasoning in *Firstcorp.* *Firstcorp* involved a nearly identical capital maintenance commitment by a holding company, Firstcorp, with respect to its subsidiary savings and loan, FF–Raleigh. In that case, FF–Raleigh entered into a consent agreement with the OTS relating to FF–Raleigh's capital deficiency. 973 F.2d at 245. On the same day, OTS served Firstcorp with a notice of charges and hearing and with a temporary cease-and-desist order. *Id.* Four days later, Firstcorp filed a lawsuit seeking to enjoin OTS from enforcing the cease-and-desist order. *Id.* The next day, Firstcorp filed a Chapter 11 bankruptcy petition. *Id.* Two days later, the OTS appointed the RTC as conservator for FF–Raleigh. *Id.*

Firstcorp argued that its control of FF–Raleigh ceased for purposes of the capital

maintenance commitment when FF–Raleigh signed the consent agreement. The Fourth Circuit rejected this argument, reasoning that the consent agreement contained express language to the contrary and that Firstcorp still retained functional control over FF–Raleigh notwithstanding the restrictions contained in the consent agreement. *Id.* at 250–51. It was in this context—that is, the existence of a consent agreement, not the existence of a conservator or receiver—that the court remarked that Firstcorp retained control of FF–Raleigh as a matter of law because of its ownership of FF–Raleigh's stock. *Id.* The court concluded that, therefore, the consent agreement did not deprive Firstcorp of control over FF–Raleigh for purposes of the capital maintenance commitment. *Id.* It is unclear whether the Fourth Circuit regarded each of these three grounds as independently sufficient to resolve the control issue, or whether these three grounds were collectively regarded as sufficient to resolve the control issue.

What is more significant about the Fourth Circuit's opinion, as it applies to this case, is the manner in which the court rejected Firstcorp's next argument. Firstcorp next argued that it lost control of

FF–Raleigh when FF–Raleigh was placed in receivership two days after it filed its bankruptcy petition. *Id.* at 251. The court stated: "We assume *arguendo* that the receivership ended Firstcorp's control over FF–Raleigh and therefore terminated its capital maintenance commitment." *Id.* (italics in original). The court then proceeded to explain that any termination of the capital maintenance commitment only absolved Firstcorp of its liability for further deterioration of FF–Raleigh's capital after the date the receiver was appointed. *Id.* Notably, the court did not even mention the statement it made only two paragraphs prior regarding Firstcorp's ownership of FF–Raleigh's stock. Instead, the court proceeded under the assumption that appointment of the receiver terminated the capital maintenance commitment. Thus, the reasoning of the Fourth Circuit in *Firstcorp* suggests that it would have reached the same conclusion if it had actually decided the issue of whether the appointment of a conservator or receiver[7] terminated the holding company's control over the subsidiary for purposes of the capital maintenance commitment.[8]

■ This conclusion is also consistent with the commonly understood meaning of

---

7. The only legal distinction the court can ascertain between a conservator and a receiver in this context is that the receiver has the power to liquidate, whereas a conservator does not. *See* 12 U.S.C. § 1821(d)(2)(E). Thus, there is no material legal distinction between the two. Indeed, they are identical in the only material aspect, which is the fact that both succeed as a matter of law to the rights, titles, powers, and privileges of stockholders. *See id.* § 1821(d)(2)(A).

8. The only other case that received much discussion from the parties is *Office of Thrift Supervision v. Overland Park Financial Corp. (In re Overland Park Financial Corp.)*, 236 F.3d 1246 (10th Cir.2001). That case, however, although it involved a similar capital

maintenance commitment, does not provide the court with any assistance in resolving the definition-of-control issue in this case. Notwithstanding the lack of a similar "control" provision in that case, one of the defenses raised was that the capital maintenance commitment was terminated when the OTS seized the savings and loan. *Id.* at 1249 & n. 6. The court reversed and remanded the case on other grounds, and explained that this defense should be resolved by the bankruptcy court. *Id.* at 1253. On remand, the bankruptcy court dismissed this and other defenses for lack of prosecution. *Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 300 B.R. 534, 538–39 (D.Kan.2003).

the word control. The appointment of a conservator, by its very nature, results in the conservator taking control of the entity. *See Franklin Savings Ass'n v. Office of Thrift Supervision*, 35 F.3d 1466, 1471 (10th Cir.1994) (observing that FSA and its stockholders did not retain authority to control specific assets after the conservator took control); *see also, e.g., Delta Sav. Bank v. United States*, 265 F.3d 1017, 1023 (9th Cir.2001) (noting the OTS can place a bank "under the *control* of a conservator or receiver" (emphasis added)); *Long v. Turner*, 134 F.3d 312, 314 n. 1 (5th Cir. 1998) (noting that the RTC gained control of a bank by virtue of being appointed conservator); *First Fed. Sav. Bank & Trust v. Ryan*, 927 F.2d 1345, 1358 (6th Cir.1991) ("It is well established that banks or savings and loans can legitimately be placed under the *control* of a conservator or receiver …." (emphasis added)); *Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266, 274 (5th Cir. 1989) (referring to the FSLIC's control as conservator).

OTS makes much of the fact that FSC still retained some functional control over FSA in the sense that FSC was able to cause FSA to join in numerous legal attacks against the OTS, the RTC, the FDIC, and the federal government for their actions in allegedly improperly seizing and mismanaging FSA. While that may be, the fact nevertheless remains that the OTS succeeded in vindicating the RTC's right to control FSA in the conservatorship litigation and then again later in the receivership litigation. As such, the RTC is legally regarded as having taken control of FSA when it was appointed conservator. Accordingly, FSC's control over FSA ceased, for purposes of the capital maintenance commitment, on February 15, 1990.

**B.  Capital Deficiency as of February 15, 1990**

■  Because the capital maintenance commitment remained in force until February 15, 1990, OTS has a valid claim against the bankruptcy estate for any capital deficiency that had matured by that date. *See Firstcorp*, 973 F.2d at 251 (explaining that termination of the capital maintenance commitment did not absolve the holding company of any existing, matured liability). It is undisputed that a capital deficiency did not exist on that date according to the books and records of FSA, which reflected more than $100 million in paid-in capital resulting from the tax forgiveness transaction. In the OTS's statement of material facts, the OTS contends that FSA's accounting methods were improper. Notably absent from the OTS's briefing, however, is any legal argument suggesting that FSA should be regarded as having actually been capitally deficient on February 15, 1990.

FSA has met its burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law on this issue. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), was in effect on the date the RTC was appointed conservator. One of the regulations promulgated pursuant to FIRREA provides: "Except as otherwise provided by the Office by rule, regulation, or order made specifically applicable to financial statements governed by this section, financial statements shall … [b]e prepared and presented in accordance with generally accepted accounting principles …." 12 C.F.R. § 563c.1(b)(1). The record before the court uncontrovertedly reveals that the tax forgiveness transaction was in accordance with GAAP. The record does not reveal any rule or regulation suggesting that FSA should have reported its capital

according to any other standard.[9] Further, no directive from the OTS, cease-and-desist order, or court-ordered injunction was in place at that time directing FSA to reverse the tax forgiveness transaction. Certainly, Mr. Martens' April 1989 letter to FSA's auditor revealing his thoughts on the matter does not rise to the level of an "order" that would trump GAAP principles under 12 C.F.R. § 583c.1(b)(1). Indeed, the RTC's Form 8–K filing reported FSA's capital was reported in compliance with GAAP principles.

The OTS has failed to present any contrary evidence to suggest that the tax forgiveness transaction was legally ineffective. Therefore, it cannot reasonably be inferred that FSA was capitally ·deficient on February 15, 1990. Accordingly, the OTS does not have a valid capital deficiency claim against the estate and FSC's motion for summary judgment on the OTS's claim is granted.

## III. Priority of Claim

Next, the court will turn its attention to the OTS's motion for summary judgment. In that motion, the OTS seeks summary judgment on the basis that its capital deficiency claim is entitled to priority pursuant to 11 U.S.C. § 365(o) over the administrative fee and expense claims of FSC's bankruptcy counsel. The court denies OTS's motion for the reason explained above (OTS does not have a valid claim against the estate) in addition to the reason explained below that the OTS's claim is not entitled to the heightened degree of priority which the OTS contends the claim should be afforded.

9. FSC briefly mentions the phrase capital under regulatory accounting practices ("RAP"). The distinction, if any, between RAP and GAAP is unclear to the court. To the extent that there is a distinction between the two, however, the only evidence in the record reveals that FSA's RAP capital exceeded FSA's

Title 11 U.S.C. § 365 addresses the trustee's rights to assume or reject the debtor's executory contracts and unexpired leases. Subsection (o) of that section provides as follows:

In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and *shall immediately cure* any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

11 U.S.C. § 365(o) (emphasis added).

The seminal case interpreting § 365(o)'s immediate cure requirement is the Fourth Circuit's opinion in *Firstcorp*. In that case, the court held that

assumption and cure under § 365(o) are prerequisites to obtaining Chapter 11 protection. If a debtor cannot "immediately" cure a deficit under a capital maintenance commitment that exists at the time of a bankruptcy filing, then § 365(o) requires that debtor to proceed not under Chapter 11 but under Chapter 7, to which § 365(o) does not apply.

*Id.* at 247.

The Tenth Circuit was later confronted with § 365(o)'s immediate cure require-

GAAP capital. Given the fact that FSC's capital was adequate under GAAP, and given the fact that FSC's RAP capital exceeded its GAAP capital, any distinction between the two is immaterial for purposes of resolving the parties' cross-motions for summary judgment.

ment. *Office of Thrift Supervision v. Overland Park Fin. Corp. (In re Overland Park Fin. Corp.)*, 236 F.3d 1246 (10th Cir. 2001). The Tenth Circuit found *Firstcorp* to be "well-reasoned and persuasive." *Id.* at 1253. It quoted the above passage from *Firstcorp* and held that the debtor's commitment to assume and cure its capital deficit had to be satisfied before the debtor could proceed with Chapter 11. *Id.*

Based upon these holdings, OTS argues that FSC should be required to effect the maximum cure possible because it is unable to entirely cure any capital deficiency. OTS contends the "immediate cure" requirement in § 365(*o*) comes ahead of and must be satisfied before the administrative fee and expense claim of FSC's bankruptcy counsel may be paid pursuant to §§ 503, 507(a)(1). This argument, however, is unsupported by the language of the statute, the Fourth Circuit's holding in *Firstcorp,* or the Tenth Circuit's holding in *Overland Park Financial. See, e.g., In re Overland Park Fin. Corp.*, 300 B.R. 534, 542 (D.Kan.2003) (rejecting the argument that § 365(*o*) requires the debtor to effect the maximum cure possible because "[n]either the statute nor the case law mandates this result").

■ Section 365(*o*) explicitly requires a cure of any capital maintenance commitment, and *Firstcorp* and *Overland Park Financial* both hold that this cure is a prerequisite to Chapter 11. The remedy for a debtor's inability to cure the capital deficiency is that the debtor may be prohibited from proceeding under Chapter 11. Notably, neither these cases nor the statutory language suggest that an alternative remedy is to require the debtor to effect the maximum cure possible. To the contrary, the maximum-cure-possible argument is in essence one involving the relative priority of the claim vis-a-vis § 503 administrative fee and expense claims. As

such, the issue is governed by 11 U.S.C. § 507, which determines the relative priority of claims. This statute specifically gives so-called ninth priority to "allowed unsecured claims based upon any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution." 11 U.S.C. § 507(a)(9). Also worth mentioning is the fact that § 365(*o*) provides that "any claim for a subsequent breach of the obligations [under a capital maintenance commitment] shall be entitled to priority under section 507." While this is admittedly not a case involving a "subsequent" breach, this quoted portion of the statute nevertheless lends support to the conclusion that the level of priority to be given to a capital deficiency claim is governed by § 507, not § 365(*o*). To hold that § 365(*o*) gives superpriority to such capital maintenance deficiency claims would strip § 507(a)(9) of any effect. In sum, the maximum-cure-possible theory improperly confuses the trustee's assumption and cure requirements under § 365(*o*) with the rules of priority set forth in § 507.

■ Here, § 365(*o*) simply does not apply because OTS does not ask the court to prohibit FSC from proceeding in Chapter 11, which was the remedy sought by the government in both *Firstcorp* and *Overland Park Financial. Overland Park Fin.*, 236 F.3d at 1250 (motion at issue was a "motion for immediate cure and for dismissal of the case under" § 365(*o*)); *Firstcorp*, 973 F.2d at 245–46 (motions at issue sought a court order directing Firstcorp to assume its capital maintenance commitment and "to immediately cure the deficiency in the capital maintenance obligation existing as of the date of the bankruptcy filing"). By comparison, · in this case the OTS asks the court to give its claim priority over the § 503 administra-

tive fee and expense claims of counsel for FSC. As such, the OTS has raised the issue as one of priority, which is governed by the plain language of § 507, not § 365(o). Under § 507, OTS's claim is not entitled to priority over the administrative fee and expense claims of FSC's bankruptcy counsel, which are given so-called first priority under § 507(a)(1). Accordingly, OTS's motion for summary judgment is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that FSC's motion for summary judgment (Doc. 136) is granted and the OTS's motion for summary judgment (Doc. 137) is denied. The clerk is directed to enter judgment in favor of Franklin Savings Corporation and against the Office of Thrift Supervision. This case is dismissed.